IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

DONNA RENEE MAITLAND,    )
      Plaintiff,         )
                               )
        v.              )     CIVIL NO. 3:12-cv-528(HEH)
                               )
CAROLYN W. COLVIN,      )
      Commissioner of Social Security,  )
      Defendant.        )
_____)

## REPORT AND RECOMMENDATION

Donna Maitland ("Plaintiff") is 39 years old and worked as a warehouse worker, project

supervisor, general clerk, machine operator and cashier. On December 16, 2009, Plaintiff

applied for Social Security Disability ("DIB") and Supplemental Security Income ("SSI") under

the Social Security Act (the "Act") with an alleged onset date of December 15, 2009, claiming

disability due to obesity, degenerative disc disease of the cervical spine, degenerative joint

disease/spondylosis of the lumbosacral spine with radiculopathy, bipolar disorder/depression,

and anxiety disorder. Plaintiff's claim was presented to an administrative law judge ("ALJ"),

who denied Plaintiff's requests for benefits. The Appeals Council subsequently denied

Plaintiff's request for review on May 29, 2012.

Plaintiff now challenges the ALJ's denial of benefits, asserting that substantial evidence

did not support the ALJ's determination regarding Plaintiff's Residual Functioning Capacity

("RFC") in light of a subsequent surgery following Plaintiff's hearing in front of the ALJ.

(Plaintiff's Memorandum in Support of Motion for Summary Judgment ("Pl.'s Mem.") at 7.)

Plaintiff further contends that, because the ALJ's assessment of Plaintiff's RFC is incorrect, the

ALJ improperly formulated his hypothetical questions to the Vocational Expert. (Pl.'s Mem. at 7.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment, which are now ripe for review.[1] Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, it is the Court's recommendation that Plaintiff's Motion for Summary Judgment (ECF No. 15) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 18) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Plaintiff challenges whether substantial evidence supported the ALJ's determination regarding Plaintiff's RFC and whether the ALJ properly formulated the hypothetical that he posed to the vocational expert. Therefore, Plaintiff's educational and work history, Plaintiff's medical history, consulting physicians' opinions, reported activities of daily living, Plaintiff's testimony, and the Vocational Expert's ("VE") testimony are summarized below.

A.  Plaintiff's Education and Work History

Plaintiff graduated high school and attended college for two years, but did not obtain a college degree. (R. at 49.) Plaintiff most recently worked at WalMart as a warehouse worker

---

[1]     The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

from June 2007 to December 2009. (R. at 199.) Plaintiff has also previously worked at Staples as a general clerk for two months, at OfficeMax for two years as a production supervisor, at Fedex Kinko's for one year as a project coordinator, at International Paper Company for two years as a machine operator, at MeadWestVaco for two years as a production supervisor and at 7-11 for six months as a cashier. (R. at 199-205.)

B. Plaintiff's Medical History

Several years before the onset of her alleged disability, Plaintiff had two anterior cervical fusions, resulting in the fusion of her C5-C6 and C6-C7 vertebrae. (R. at 372.) Plaintiff was seen by multiple doctors in 2008 and 2009 for her back pain. On January 5, 2008, Plaintiff injured her back lifting antifreeze at work. (R. at 377.) The next day Plaintiff saw Dr. Teresa Stillion, M.D., where Plaintiff's X-rays revealed mild scoliosis and degeneration of the lumbar spine. (R. at 377.) Plaintiff saw Dr. Hamid Hassanzadeh, M.D., on January 22, 2008, complaining of lower back pain, and Dr. Hassanzadeh noted mild degeneration at the L3-L4 level and minimal bulging at the L4-L5 level, but reported an essentially negative result. (R. at 333.) Plaintiff returned to Dr. Hassanzadeh on March 4, 2008, who noted mild cervical spondylosis, but wrote that the previous cervical fusions appeared normal and there was no canal or foraminal stenosis. (R. at 372-373.) In June 2008, Plaintiff was diagnosed with carpal tunnel in her right hand, and she underwent carpal tunnel release surgery on June 6, 2008, which appeared to be successful. (R. at 393.) On October 28, 2008, Plaintiff had a Phyllodes tumor in her left breast removed. (R. at 408.)

On April 20 and November 22, 2009, Plaintiff reported to the emergency room for severe back pain and was given Vicodin and Toradol, respectively, and discharged shortly thereafter in stable condition. (R. at 496, 511.) On both occasions the cervical spine examination appeared

largely unremarkable. (R. at 496, 513.) On December 1, 2009, Dr. William Phipps, M.D., treated Plaintiff for her lower back and neck pain. (R. at 554.) Plaintiff's MRIs revealed mild bilateral facet hypertrophy at the L4-L5 level and some degeneration at the C3-C4 and C4-C5 levels. (R. at 554-556.) On December 8, 2009, Plaintiff reported to Dr. George Gruner, M.D., complaining of severe pain in her upper back that radiated down her left arm. (R. at 475.) At that time her previous fusions looked unremarkable and an exam for spondylosis of the thoracic spine was negative. (R. at 475-476.) Plaintiff then saw Dr. David Geckle, M.D., on December 16, 2009, who recommended further cervical surgery based on the earlier MRI results, but noted that the degeneration in Plaintiff's lower back was not sufficient to warrant surgical intervention. (R. at 481.) On December 19, 2009, Plaintiff was briefly hospitalized for a fall, but discharged in stable condition. (R. at 486-488.) On December 22, 2009, Dr. Geckle reported that Plaintiff was completely incapacitated and could not return to work until at least February 24, 2010. (R. at 529.)

On January 5, 2010, Dr. Geckle performed a C3-C5 cervical fusion and decompression; Plaintiff appeared to be doing well at her post-operative visit on January 27, 2010. (R. at 530-531.) On March 5, 2010, Plaintiff began seeing Dr. William Squires, M.D., a primary care physician, complaining of neck and back pain and cold symptoms. (R. at 610-612.) During Plaintiff's April 22, 2010 appointment with Dr. Geckle, he again noted mild degeneration at the L4-L5 level. (R. at 560.) Plaintiff also reported to Dr. Peter Crane, M.D., a pain management specialist, on May 4, 2010, complaining that her severe pain had not subsided since her surgery in January of that year. (R. at 578.) Dr. Crane prescribed Flexeril and Percocet and administered an epidural steroidal injection at the L4-L5 level on May 10, 2010. (R. at 575-578.)

On February 11, 2010, Plaintiff sought treatment from Dr. Richard Curtis, M.D., for her depression; Plaintiff reported hopelessness, isolation, anxiety and manic feelings and was diagnosed with bipolar disorder. (R. at 568-572.) Dr. Curtis prescribed Elavil, Xanax and Zyprexa. (R. at 572.) Plaintiff returned to Dr. Curtis on March 15, 2010, and reported that she still felt depressed, anxious, and isolated. (R. at 567.) Despite adjustments to her medications, Plaintiff continued to report symptoms of depression and anxiety during her subsequent visits on April 9 and May 6, 2010. (R. at 565-566.)

Plaintiff returned to Dr. Squires on May 14, 2010, who noted that Plaintiff appeared overly sedated and recommended that Plaintiff discontinue all medications temporarily except Xanax and Flexeril. (R. at 600.) On May 5, 2010, Dr. Squires opined that Plaintiff could lift no more than 10 pounds and could not sit or stand for any sustained period of time. (R. at 596-602.) Plaintiff continued to report severe pain during her visits to Dr. Squires on May 28, August 4, and October 8, 2010, despite Dr. Squires' adjustments to Plaintiff's medications. (R. at 588-595.) Plaintiff began seeing Velva Bennett, N.P., for pain management and primary care in late October 2010, because of insurance concerns. (R. at 632.) On November 1, 2010, Plaintiff reported to the VCU Emergency Department, complaining of a shoulder injury. (R. at 639.) Plaintiff was diagnosed with a contusion and discharged the same day. (R. at 639.) She was also diagnosed with a thyroid cyst on February 8, 2011, and was referred to an endocrinologist. (R. at 622.)

On September 8, 2011, Plaintiff consulted Dr. Abilio Reis, M.D., for her neck and back pain. (R. at 674.) Dr. Reis determined that Plaintiff had multi-level pseudarthrosis and her previous fusions had not healed properly, and recommended a complete posterior cervical fusion and decompression from C2-T2, which he warned would be much more involved and painful

than Plaintiff's previous surgeries. (R. at 674.) On September 26, 2011, Dr. Reis performed a C2-T2 posterior spinal fusion, C3-C5 laminectomy, facetectomy and foraminotomy on the left side for 3 levels (C3, C4, C5), cervical instrumentation C2-T2 posteriorly and C6 laminectomy without facetectomy and foraminotomy. (R. at 678.) On October 10, 2011, Plaintiff demonstrated "improved symptoms overall," 5/5 strength in all muscles in the bilateral upper extremities and no evidence of weakness. (R. at 683.) On November 9, 2011, Plaintiff's incision was well-healed and she had 5/5 strength in all muscles of the bilateral upper extremities. (R. at 684.) X-rays showed that the hardware was placed well with early consolidation of the fusion throughout. (R. at 684.) Plaintiff was no longer required to wear a neck brace and Dr. Reis reported that Plaintiff only reported pain in her right upper extremity going to her thumb and was "overall feeling improved than before." (R. at 684.)

C. Non-treating State Agency Doctors' Opinions

On April 8, 2010, David L. Neimeier, Ph.D., a non-treating state agency psychologist, opined that Plaintiff was moderately limited in her ability to: (1) carry out detailed instructions, (2) understand and remember detailed instructions, (3) maintain attention and concentration for extended periods, (4) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, (5) sustain an ordinary routine without special supervisions, (6) work in coordination with or in proximity to others without being distracted by them, (7) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without unreasonable rest periods, (8) interact appropriately with the general public, (9) accept instructions and respond appropriately to criticism from supervisors and (10) get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 86-87.) Plaintiff suffered no significant limitations in

6

her ability to: (1) remember locations, (2) understand and remember short, simple instructions, (3) carry out short, simple instructions, (4) make simple work-related decisions, (5) ask simple instructions and (6) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (R. at 86-87.) This assessment was affirmed by Alan D. Entin, Ph.D, ABPP, on July 23, 2010. (R. at 103-104.)

On April 13, 2010, James Wickham, M.D., a non-treating state agency physician, determined that, although Plaintiff could not perform any of her past relevant work, she could perform jobs such as a laundry folder or mail clerk subject to exertional and postural limitations. (R. at 84-85, 89.) Dr. Wickman opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently. (R. at 84.) Plaintiff suffered limitations in her ability to push or pull. (R. at 84.) He noted that Plaintiff could stand or walk and sit for about six hours during an eight-hour workday. (R. at 84.) Plaintiff could frequently climb ramps and stairs, balance, kneel and crouch and could occasionally climb ladders, ropes or scaffolds, stoop and crawl. (R. at 84-85.) Dr. Wickman determined that Plaintiff should avoid concentrated exposure to fumes, odors, dust, gases and poor ventilation. (R. at 85.) He expected that Plaintiff would have the physical capacity for light work with continual follow-up care. (R. at 82.) This assessment was affirmed by Martin Cader, M.D., on July 21, 2010. (R. at 102.)

D. Plaintiff's Activities of Daily Living

On January 26, 2010, Plaintiff wrote that she experienced constant pain that was exacerbated by activity. (R. at 212.) At that time, she had just undergone a third cervical fusion, and could not drive, push, pull or lift more than 10 pounds and had to sleep sitting up to avoid the pain. (R. at 214-215.) Her husband prepared soft food for her and helped her dress and wash her hair. (R. at 215-216.) Her husband drove her when she left the house to attend doctors'

appointments and to go to the drugstore. (R. at 217.) She wore a brace at all times due to her recent surgery. (R. at 220.)

Plaintiff could pay her bills, count change, handle a savings account and use a checkbook. (R. at 217.) She spent most of her days watching television, but spoke to her parents on the phone daily. (R. at 218.) Plaintiff marked that her lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing and using her hands were limited by her injuries, but that she could pay attention for as long as needed and could walk for 20 minutes before needing to rest. (R. at 219.) She attested that she dealt with stress and change poorly, and took Xanax to help with her social anxiety. (R. at 220.)

E. Third Party Function Report

On January 26, 2010, Plaintiff's mother, Jody G. Giles, filled out a third-party function report. (R. at 222.) Ms. Giles reported that her daughter was "totally incapacitated" and "in constant pain" due to her third back surgery which had occurred only a few days before. (R. at 223.) Ms. Giles marked that Plaintiff was limited in her ability to lift, climb stairs, stand, kneel, squat, reach, use her hands, bend, walk and get along with others. (R. at 228.) She wrote that Plaintiff could pay attention and follow instructions well. (R. at 229.) Because of her recent surgery, Plaintiff wore a neck brace constantly. (R. at 230.)

F. Plaintiff's Testimony

On August 26, 2011, Plaintiff testified before an ALJ that she was recently divorced and lived with her mother. (R. at 32.) Plaintiff had three grown children and three grandchildren, but didn't help care for them because of her neck pain. (R. at 50.) Plaintiff testified that after being laid off in January 2010, she returned to work for two days in June 2010, but her pain was too severe to allow her to work. (R. at 33.) Plaintiff wore a cervical collar occasionally in the

evenings and used a heating pad to alleviate her pain. (R. at 34-35.) She rated her neck pain on a daily basis at 6/7 out of 10 with medication and her back pain at about 5 out of 10, and said that reaching and lifting tended to exacerbate the pain. (R. at 36-37.) She could neither stand nor sit for extended periods of time and had to alternate between the positions; she also experienced significant pain while lying down. (R. at 57-59.) The up-and-down mobility of Plaintiff's neck was significantly decreased and her reaching ability was reduced. (R. at 39-40.)

She also testified that her doctors recommended a fourth neck surgery to try to help with the pain, and had ordered a CT and MRI in preparation for proceeding with this surgery. (R. at 35-36, 65-66.) Plaintiff informed the ALJ that this surgery could result in the fusion of her entire C-spine, so the ALJ agreed to consider these records in his determination once he received them. (R. at 65, 75.)

Plaintiff testified that she drove every day, usually to go to the grocery store, the drug store or doctors' appointments. (R. at 33.) She could walk for 30-45 minutes at a time depending on the weather, stand for 20 minutes and lift a gallon of milk. (R. at 37-38.) Plaintiff testified that she could still tie a shoe, fix a sandwich, turn pages in a book, hold a pen, write a short note and grasp a soda can. (R. at 38-39.) She could also shampoo her hair, peel a potato, bend down and pick up clothing from the floor, use the computer once a month for 15 minutes at a time, load and unload the dishwasher, and launder her clothes. (R. at 41-42.) She noted that a retail job would be difficult because of her neck pain and fibromyalgia. (R. at 44.)

Plaintiff took Lamictal, Elavil and Xanax for her social anxiety and depression in addition to Lyrica and oxycodone for her pain. (R. at 43-45, 54.) She had crying spells twice a week and, during 10-12 days a month, she would stay in bed and sleep for twelve or more hours because of her depression, though she would drive to the drugstore or a doctor's appointment on

these days if necessary. (R. at 52-53.) Plaintiff was hospitalized for suicide attempts three times when she was younger and admitted for psychiatric problems as recently as 2008. (R. at 47.) She struggled with large crowds, though she testified that being present at the hearing did not trigger her social anxiety. (R. at 43-44, 51.) She had also been diagnosed as being bipolar and she experienced severe mood swings. (R. at 55.)

## G. VE Testimony

The VE testified that Plaintiff's general supervisor and clerical skills would be transferrable to other light and sedentary positions, though her machine operation skills would not. (R. at 61.) The ALJ posed a hypothetical to the VE, indicating an individual with a high school education and:

> a combination of sedentary to light residual functional capacity, but . . . limit to ten pounds on the lift, carry. Has to arise from a seated position or stand with the ability to sit three times an hour in place . . . Because of her diminished range of motion of the neck and also a history of epilepsy, no heights, few steps, no use of hazardous machinery; can understand, remember, and carry out simple instructions. Because of mood changes and avoidance of large crowds . . . no more than occasionally interact with others; reaching, handing, and fingering can be frequent at times, but not repetitive, such as that required in assembly line work . . . only occasional squat, crawl, kneel, stoop, or crouch.

(R. at 61.) The VE testified that such an individual could work as a production inspector grader, a charge account clerk, a laundry press operator or a mail clerk. (R. at 63, 74.) However, if Plaintiff could not meet normal attendance requirements due to the 10 days per month that she spent in bed, she would be unemployable. (R. at 64.)

## II. PROCEDURAL HISTORY

Plaintiff protectively filed her current applications for DIB and SSI on December 16, 2009, claiming disability due to obesity, degenerative disc disease of the cervical spine, degenerative joint disease/spondylsis of the lumbosacral spine with radiculopathy, bipolar

disorder/depression, and anxiety disorder. (R. at 10, 12-13.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[2] (R. at 10.) On August 26, 2011, accompanied by counsel, Plaintiff testified before an ALJ. (R. at 10.) On December 2, 2011, the ALJ denied Plaintiff's application, finding that she was not disabled under the Act, because, based on her age, education, work experience and residual functional capacity, there were jobs that Plaintiff could perform which exist in significant numbers in the national economy. (R. at 20.) The Appeals Council subsequently denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1.)

## III. QUESTIONS PRESENTED

1. Did substantial evidence exist to support the Commissioner's determination regarding Plaintiff's Residual Functioning Capacity in light of her fourth surgery in September 2011, subsequent to the ALJ hearing?

2. Did the Commissioner's hypothetical to the Vocational Expert account for all of Plaintiff's substantial impairments in light of her fourth surgery in September 2011?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a

---

[2]   Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. Part 404, Subpart Q; see also § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472; *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact — if the findings are supported by substantial evidence — are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477 (citation omitted). If the ALJ's determination is not supported by substantial evidence on the record or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity"

("SGA").[3]  20 C.F.R. §§ 416.920(b), 404.1520(b).  If a claimant's work constitutes SGA, the

analysis ends and the claimant must be found "not disabled," regardless of any medical

condition.  *Id.*  If the claimant establishes that she did not engage in SGA, the second step of the

analysis requires her to prove that she has "a severe impairment . . . or combination of

impairments which significantly limit[s] [her] physical or mental ability to do basic work

activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c).  To qualify as a severe

impairment that entitles one to benefits under the Act, it must cause more than a minimal effect

on one's ability to function.  20 C.F.R. § 404.1520(c).

    At the third step, if the claimant has an impairment that meets or equals an impairment

listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is

expected to last, for twelve months or result in death, it constitutes a qualifying impairment and

the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d).  If the impairment does not meet or

equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is

required to determine whether the claimant can return to her past relevant work[4] based on an

assessment of the claimant's residual functional capacity ("RFC")[5] and the "physical and mental

---

[3]    SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R.  Substantial work activity is "work activity that involves doing significant physical or mental activities.  Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a).  Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).  Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[4]    Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[5]    RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work

13

demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 473 (citation omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience, and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Hancock*, 667 F.3d at 472-73; *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146, n.5 (1987)). The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

---

schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.,* 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

# V. ANALYSIS

## A. The ALJ's Opinion

The ALJ found at step one that Plaintiff had not engaged in SGA since the alleged onset of her disability on December 16, 2009. (R. at 12.) At steps two and three, the ALJ found that Plaintiff had the severe impairments of obesity, degenerative disc disease of the cervical spine, degenerative joint disease/spondylsis of the lumbosacral spine with radiculopathy, bipolar disorder/depression and anxiety disorder, but that these impairments did not meet or equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, as required for the award of benefits at that stage. (R. at 12-13.) The ALJ next determined that Plaintiff had the RFC to perform sedentary work, except that Plaintiff was limited to jobs that allow her to alternate between standing and sitting three times per hour, in place, for a brief period of time with no heights, few steps and no hazardous machinery. (R. at 15.) Plaintiff was also limited to jobs that involve understanding, remembering and carrying out simple instructions with only occasional interactions with others. (R. at 15.) She can frequently, but not repetitively reach, handle and finger and should only occasionally squat, crawl, stoop and crouch. (R. at 15.)

The ALJ then determined at step four of the analysis that Plaintiff could not perform her past relevant work as a store laborer, production supervisor, general supervisor, cashier, general clerk, packaging machine operator or paper machine operator. (R. at 19.) At step five, after considering Plaintiff's age, education, work experience and RFC, and after consulting a VE, the ALJ found that there are other occupations which exist in significant numbers in the national economy that Plaintiff could perform. (R. at 19.) Specifically, the ALJ found that Plaintiff could work as a production inspector/grader or charge account clerk. (R. at 20.) Accordingly, the ALJ

concluded that Plaintiff was not disabled and was employable such that she was not entitled to benefits. (R. at 20.)

Plaintiff moves for a finding that she is entitled to benefits as a matter of law, or in the alternative, seeks reversal and remand for additional administrative proceedings. (Pl.'s Mot. at 8.) In support of her position, Plaintiff argues that substantial evidence does not support the ALJ's determination of Plaintiff's RFC and the ALJ erred by posing a hypothetical to the VE that did not include all of Plaintiff's limitations, in particular those created by a fourth cervical fusion subsequent to the ALJ hearing. (Pl.'s Mot. at 7-8.) Defendant argues in opposition that the ALJ's final decision is supported by substantial evidence and that even if it were not Plaintiff has not set forth which limitations are missing from the ALJ's RFC analysis. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") at 8.)

B.     The ALJ did not err in determining Plaintiff's RFC.

Plaintiff claims that the ALJ did not consider the effects of her fourth cervical fusion when crafting her RFC and, therefore, the RFC is not supported by substantial evidence. (Pl.'s Mem. at 7-8.) Defendant responds that Plaintiff has not offered any evidence that the ALJ did not take Plaintiff's further treatment into consideration and also has not explained in what way the RFC finding is allegedly deficient. (Def.'s Mem. at 7.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). In analyzing a claimant's abilities, an ALJ will first assess the nature and extent of the claimant's physical limitations, and then determine the claimant's RFC for work activity on a regular and continuing basis. 20 C.F.R. § 404.1545(b). Generally, it is the responsibility of the claimant to provide the evidence that the ALJ utilizes in

making his RFC determination; however, before a determination is made that a claimant is not disabled, the ALJ is responsible for developing the claimant's complete medical history, including scheduling consultative examinations if necessary. 20 C.F.R. § 404.1545(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.

After considering all of Plaintiff's physical and mental impairments, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work, except that she:

> is further limited to jobs that allow her to alternate between standing and sitting three times per hour, in place, for a brief period of time with no heights, few steps, and no hazardous machinery. Additionally, because of ongoing mood irregularities and associated symptoms, she is limited to jobs that involve understanding, remembering, and carrying out simple instructions with no more than occasional interaction with others. Reaching, handling, and fingering can be frequent at times but not repetitive, such as that required by assembly line work. Finally, she is limited to work with no more than occasional squatting, crawling, stooping, kneeling, and crouching.

(R. at 15.) "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. 404.1567(a). A sedentary job "involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." *Id.* "Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.*

The ALJ learned of Plaintiff's continuing treatment at the time of the hearing, and agreed to receive all of the related evidence and take it into consideration before his final decision, particularly since Plaintiff was far from normal retirement age. (R. at 65.) Plaintiff informed the ALJ that Dr. Reis had discussed fusing her entire cervical spine, and the ALJ agreed to receive more information concerning this surgery. (R. at 75-76.) Indeed, the ALJ's opinion chronicled Plaintiff's history of neck and back pain in detail, starting in 2008 and continuing through Dr.

Reis' September 8, 2011 evaluation. (R. at 15-18.) Referencing the September 2011 consultation, the ALJ noted that Dr. Reis offered further decompressive surgery, but that Plaintiff still "demonstrated a full range of motion, and she demonstrated 5/5 strength of all upper extremity muscle groups." (R. at 17.) Plaintiff then underwent a C2-T2 posterior cervical fusion on September 26, 2011. (R. at 678-679.) The ALJ's determination noted that "there is no evidence of post-operative complications requiring additional hospitalization or further evaluation" beyond a standard post-operative follow-up. (R. at 17.)

Additionally, substantial evidence in the record supports the ALJ's determination regarding the fourth surgery. (R. at 17, 683-684.) During Plaintiff's first post-operative visit on October 10, 2011, Dr. Reis noted that Plaintiff showed 5/5 strength in all key muscles of her bilateral upper extremities and no signs of weakness, and that Plaintiff was "doing very well." (R. at 683.) On November 9, 2011, Dr. Reis again noted that Plaintiff showed no signs of weakness and remarked that Plaintiff was "overall feeling improved than before." (R. at 684.) As such, the ALJ considered Plaintiff's fourth surgery in determining Plaintiff's RFC.

Furthermore, substantial evidence in the record supports the ALJ's determination that Plaintiff maintained the RFC to perform sedentary work except that Plaintiff is limited to jobs: (1) that allow her to alternate between standing and sitting three times per hour, in place, for a brief period of time with no heights, few steps and no hazardous machinery, (2) that involve understanding, remembering and carrying out simple instructions with only occasional interactions with others, (3) where she can frequently, but not repetitively reach, handle and finger and (4) she only occasionally squat, crawl, stoop and crouch. (R. at 15.) During her August 26, 2011 hearing, Plaintiff herself testified that she could still lift one gallon of milk, walk 30-45 minutes depending on the weather, take care of some personal needs, shampoo her

hair, peel a potato, occasionally wash laundry and load a dishwasher, drive on a daily basis, watch television, text and occasionally use a computer for 15 minutes at a time. (R. at 33-42.) Plaintiff testified that, although her ability to reach was diminished and forward flexion was reduced, she could still make a fist, pinch, tie a shoe, write and grasp a soda can. (R. at 33-42.) Plaintiff further testified that she needed to alternate between standing and sitting because of her neck pain. (R. at 57-59.) Plaintiff also testified that limited interactions in smaller groups did not trigger her anxiety. (R. at 50-51.) Plaintiff marked in her function report dated January 26, 2010 that her condition did not affect her ability to sit, remember, complete tasks, concentrate, understand, follow instructions or get along with others. (R. at 219).

State agency physicians Drs. Wickman and Cader specified that Plaintiff could lift twenty pounds occasionally and ten pounds frequently. (R. at 84, 101.) They opined that Plaintiff could stand or walk and sit for about six hours during an eight-hour workday. (R. at 84, 101.) Plaintiff could frequently climb ramps and stairs, balance, kneel and crouch and could occasionally climb ladders, ropes or scaffolds, stoop and crawl. (R. at 84-85, 101-02.) State agency psychologists Drs. Neimeier and Entin opined that Plaintiff suffered no significant limitations in her ability to: (1) remember locations, (2) understand and remember short, simple instructions, (3) carry out short, simple instructions, (4) make simple work-related decisions, (5) ask simple instructions and (6) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (R. at 86-87, 103-04.)

Following Plaintiff's fourth surgery in September of 2011, Dr. Reis noted that Plaintiff was "overall feeling improved than before," X-rays showed that the hardware was well-placed with early consolidation throughout and Plaintiff was no longer required to wear a neck brace.

(R. at 684). None of the available evidence implies that this surgery worsened Plaintiff's condition in the long-term.

Because the ALJ considered Plaintiff's fourth operation and in fact the record shows that Plaintiff's condition was improving throughout the fall of 2011, and substantial evidence supports the ALJ's determination that Plaintiff has the RFC to perform a limited range of sedentary work, the ALJ did not err in making Plaintiff's RFC determination.

2. The ALJ's hypothetical to the VE is supported by substantial evidence.

Plaintiff argues that the ALJ relied upon flawed VE testimony. (Pl.'s Mem. at 8.) First, Plaintiff argues that the VE's testimony was based upon the ALJ's RFC, which itself was not supported by substantial evidence. (Pl.'s Mem. at 7-8.) Second, Plaintiff argues that the ALJ failed to present a hypothetical question that accurately accounted for Plaintiff's limitations created by her fourth cervical fusion. (Pl.'s Mem. at 7.) Defendant argues that the ALJ did not err in relying upon the VE's testimony, because Plaintiff has not proffered any additional limitations resulting from the September 2011 surgery. (Def.'s Mem. at 7-8.)

At the fifth step in the sequential analysis, the ALJ must determine whether a claimant can perform any other work available in significant numbers in the national economy, considering the claimant's age, education, and past work experience. 20 C.F.R. §§ 404.1566, 416.966. Step five is reached when the claimant has not engaged in substantial gainful activity and has a severe impairment that does not meet or equal the listings, but nevertheless prevents a claimant from performing past relevant work. In assessing a claimant's ability to perform other work within the economy, the ALJ will look at exertional limitations – those limitations or restrictions which impact non-strength activities such as concentration and the ability to follow instructions. 20 C.F.R. §§ 404.1569, 416.969. At step five, the burden of proof shifts to the

Commissioner to establish that claimant has the ability to perform other work. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

If the claimant cannot perform her past relevant work, the ALJ may rely on the testimony of a VE to determine whether jobs exist in significant number that the claimant could perform, usually by posing a hypothetical question. When relying on VE testimony based on hypothetical questions, the hypotheticals posed must account for all of the claimant's limitations as shown by the record. *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). If limitations are omitted, the VE's testimony is of limited value and may not constitute substantial evidence. *Johnson v. Barnhard*, 206 F.Supp.2d 757, 767 (4th Cir. 2006) (citing *Walker*, 889 F.2d at 50). Failing to consider limitations shown by the evidence and then relying upon the errant hypothetical to form an opinion about the availability of work suitable to the claimant is error. *Hancock v. Barnhart*, 206 F.Supp.2d 757, 767 (W.D. Va. 2002). "However, the ALJ need only include in his questioning those impairments which he has found to be credible. If an ALJ does not believe that the claimant suffers from a[n] alleged impairment — and if substantial evidence supports such a conclusion — then the ALJ is not required to include that impairment in questioning the VE." *Wilkerson v. Astrue*, 2011 WL 3951165 (E.D.N.C. Aug. 19, 2011). Additionally, even if the ALJ's decision contains an error, Plaintiff, as the moving party, has the burden of showing that the error would have changed the ALJ's decision. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). Furthermore, if the error is not self-evident, "the party seeking reversal normally must explain why the erroneous ruling caused harm." *Id.* at 410.

In this case, the ALJ determined that Plaintiff was unable to perform past relevant work, but had the RFC to perform sedentary work, except that she must be able to alternate between standing and sitting three times per hour, avoid heights, steps and hazardous machinery, follow

only simple instructions and occasionally interact with others, and only occasionally squat, crawl, stoop, kneel and crouch. (R. at 15, 19.) Additionally, the ALJ determined that Plaintiff could not reach, handle and finger repetitively, as is required for assembly line work. (R. at 15.) Based on this determination, the ALJ asked the VE the following hypothetical:

> [Consider] a younger individual, high school education, possesses a driver's license . . . Let's say a combination of sedentary to light residual functional capacity, but I want to limit to ten pounds on the lift, carry. Has to arise from a seated position or stand with the ability to sit three times an hour in place for a brief period of time. Because of her diminished range of motion of the neck and also a history of epilepsy, no heights, few steps, no use of hazardous machinery; can understand, remember, and carry out simple instructions. Because of mood changes and avoidness [sic] of large crowds, let's – she should only – no more than occasionally interact with others; reaching, handling, and fingering can be frequent at times, but not repetitive, such as that required in assembly line work; only consistent with the DDS determination . . . only occasional squat, crawl, kneel, stoop, or crouch. What, if any, sedentary, sit, stand [jobs exist with this description]; what, if any light sit, stand?

(R. at 61.) The VE described several such jobs, including production inspector grader and mail clerk. (R. at 62-74.) As discussed above, the ALJ's determination of the RFC was supported by substantial evidence.

Plaintiff also claims that the ALJ's hypothetical was inappropriate because he reasoned that "[t]here is no evidence of post-operative complications [following the third cervical fusion] requiring additional hospitalization or further evaluation," when in fact Plaintiff required a fourth surgery soon after the hearing. (Pl.'s Mem. at 7.) However, at the time that the decision was issued in December, Dr. Reis had determined at Plaintiff's October and November post-operative visits that her symptoms appeared to be improving, the hardware was well-placed, and there were early signs that the operation had been successful and at that time there appeared to be no evidence of post-operative complications. (R. at 683-684.) He noted that Plaintiff was "overall feeling improved than before," demonstrated 5/5 strength in her bilateral upper extremities and

was gradually reducing her pain medication. (R. at 683-684.) During her November 9, 2011 visit, Plaintiff reported no pain except in her right upper extremity going to her thumb. (R. at 684.)

Plaintiff does not allege any new or different specific long-term impairments arising from her September 2011 surgery that were not accounted for by the ALJ's hypothetical, and the record does not provide any evidence of such impairments. Although she was still recuperating on November 9, 2011— the time of the last report received before the ALJ's decision— the record in no way establishes that the surgery worsened her condition and would constitute a change in her RFC such that it would affect the limitations set forth in the hypothetical. Therefore, there is no evidence that, even though Plaintiff received further treatment subsequent to the hearing, the ALJ's reasoning constitutes harmful error. Thus, the hypothetical was properly formulated and served as a proper basis for the VE's testimony.

## VI. CONCLUSION

For the reasons set forth herein, it is the Court's recommendation that Plaintiff's motion for summary judgment (ECF No. 15) be DENIED; that Defendant's motion for summary judgment (ECF No. 18) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Henry E. Hudson and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of**

23

any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated: July 2, 2013